**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION**

| | |
|---|---|
| SHERRY ANN HUGHES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CAUSE NO. 3:16-CV-702-MGG |
| | ) |
| NANCY A. BERRYHILL, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**OPINION AND ORDER**

On October 12, 2016, Plaintiff, Sherry Ann Hughes ("Hughes") filed a complaint in this Court. In her complaint, Hughes is seeking to vacate the Social Security Commissioner's final decision to deny her application for disability benefits and remand the matter for further administrative proceedings, to include a *de novo* hearing and decision.

Hughes filed her opening brief on February 20, 2017, and the Commissioner of Social Security ("Commissioner") filed a response on June 2, 2017 asking the Court to affirm the agency's decision to deny benefits. This matter became ripe on June 16, 2017 when Hughes filed her reply brief. This Court may enter a ruling in this matter based on the parties' consent under 28 U.S.C. § 636(c), and 42 U.S.C. § 405(g).

**I. PROCEDURE**

On March 19, 2013, Hughes filed an application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") pursuant to 42 U.S.C. §§ 416(i), 423 alleging an onset date beginning May 18, 2012. The Social Security Administration ("SSA") denied Hughes' application initially on June 4, 2013, and again upon reconsideration on

September 20, 2013. Upon Hughes' request, a hearing was held before an administrative law judge ("ALJ") on April 13, 2015, in which Hughes and an impartial vocational expert testified. On April 30, 2015, the ALJ issued his decision finding that Hughes was not disabled at Step Five of the evaluation process and denied her application for benefits. On August 12, 2016, the Appeals Council denied Hughes' request for review, making the ALJ's decision the final decision of the Commissioner. Hughes then sought judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g) by filing her complaint in this Court on October 12, 2016.

## II.  RELEVANT BACKGROUND

Hughes was born on May 3, 1961, and was 51 years old on the alleged disability onset date. Hughes is seeking disability benefits based upon degenerative disc disease, chronic obstructive pulmonary disease ("COPD"), depression, anxiety, and sciatica.

### A.  Plaintiff's Testimony

At the hearing before the ALJ, Hughes testified that she believes she cannot work due to the intensity and persistence of her pain. She stated that she could only stand for five to ten minutes at time and only sit for twenty to thirty minutes at a time. Thus, she testified that she must constantly shift between sitting and standing. She stated that she could not walk long distances and estimated that she could only walk about ten feet at a time. Hughes testified that at times she feels pain and numbness in her hands, which sometimes causes her to drop things. She stated that she is unable to stoop or squat and has trouble getting off the floor, but that she is able to bend to touch her knees. On a ten-point scale, Hughes described her pain as a five or six out of ten with medication and an eight or nine out of ten without medication. She stated that her

pain is constant. She confirmed that she is taking Lyrica and hydrocodone for pain, and other medications for her COPD and depression.

Hughes also testified that she was capable of independently performing some housework and errands. She stated that she drove about twice a week to doctor's appointments and the grocery store. When grocery shopping, she stated that she uses a motorized cart because she cannot walk from the front of the store to the back. She testified that she splits household chores with her boyfriend, but that she has to work in shifts due to her pain. She also testified that she cannot open jars but that she is able to lift a gallon of milk with one hand and move it a short distance.

Hughes stated that she is a candidate for surgery to relieve some of her back pain but that she has not been able to quit smoking, which is necessary for the surgery to be performed. She testified that her multiple attempts to quit, including the use of Chantix, have failed.

### B. Medical Evidence

#### 1. Treatment History

In May of 2010, Hughes began seeking treatment for chronic back pain. On May 5, 2010, a nurse practitioner examined Hughes for left buttock and thigh pain, potentially related to chronic back pain. [DE 15 at 3]. This examination found no tenderness on palpation and a straight leg test was negative. [*Id*.]. However, on May 12, 2010, a primary care physician, Bryan Holm, M.D., examined Hughes and found pain and tenderness along her lower spine and performed a straight leg test that was positive. [*Id*.]. Dr. Holm diagnosed Hughes with lumbar disc degeneration and prescribed medicine for her pain. [*Id*.]. At a follow up visit with Dr. Holm on May 26, 2010, Dr. Holm noted that Hughes' pain and tenderness had improved, but a straight leg test was still positive on both legs. [*Id*.].

On January 24, 2012, Hughes sought treatment from Jon Shull, M.D., for lower back pain as well as shooting and stabbing pain radiating down her left leg. [*Id*.]. Dr. Shull noted tenderness on palpation in Hughes' medium and lower back and performed a straight leg test, which was positive on her left leg. [*Id*.]. Dr. Shull also diagnosed Hughes with degenerative disc disease, prescribed new pain medication, and referred Hughes to physical therapy. [*Id*.]. At a follow-up appointment with Dr. Shull on March 13, 2012, another straight leg test performed on Hughes' left leg was positive. [*Id*. at 4]. On December 22, 2012, Hughes sought emergency room treatment for fever and body aches. [*Id*.]. The emergency room doctor noted tenderness to palpation across Hughes' back, but performed a straight leg test with negative results. [*Id*.].

On June 27, 2013, Hughes began receiving treatment with Keyna Martinez, M.D., for chronic back pain, with shooting pain in her left leg and buttocks, depression, menopause, anxiety, and COPD. [*Id*.]. Dr. Martinez diagnosed Hughes with degenerative joint disorder, menopause, COPD bronchitis, depression, and insomnia; Dr. Martinez also prescribed medication and referred Hughes to physical therapy. [*Id*.]. On July 17, 2013, Hughes' spine was X-rayed revealing Grade I spondylolisthesis of the L4 and L5 secondary to degenerative arthropathy, mild disc space narrowing, and facet degenerative hypertrophy at the lumbosacral junction. [*Id*.]. This prompted Dr. Martinez to, once again, refer Hughes to physical therapy on July29, 2013. [*Id*.].

Hughes began physical therapy on September 9, 2013. [*Id*. at 5]. At her initial physical therapy evaluation, her physical therapist, Leslie Fuchs, DPT, noted sharp back pain, limited rotation, diminished reflexes on Hughes' left side, tenderness to palpation, which was stronger on the left side of Hughes' back, and positive straight leg and slump tests. [*Id*.]. Hughes was

4

unable to meet any of her goals through five physical therapy appointments, so she was recommended continued therapy and referred to a specialist. [*Id*.].

Another X-ray, conducted on October 16, 2013, revealed that Hughes had Grade I approaching Grade II anterolisthesis of the L4 relative to L5 and mild disc space narrowing at the L4–L5 level. [*Id*.]. An MRI, performed on January 30, 2014, showed chronic severe degenerative facet joint arthropathies at L4–L5 with Grade II spondylolisthesis, moderately severe spinal canal stenosis at L5, and early degenerative facet joint arthropathy at L2–L3 and L3–L4. [*Id*.]. Hughes was given a lumbar epidural steroid injection to help ease her pain on February 14, 2014. [*Id*.].

Dr. Fuchs noticed an improvement in Hughes pain at her physical therapy appointment on February 19, 2014. However, when Hughes next returned to therapy on April 10, 2014, her physical therapist reported that Hughes was unable to perform any tests due to pain. [*Id*.]. On June 20, 2014, Hughes' physical therapist noted that Hughes' pain seemed to be interfering with her concentration and that Hughes had an antalgic gait. [*Id*.]. Her therapist recommended that Hughes discontinue physical therapy, and Hughes halted physical therapy treatment on August 11, 2014. [*Id*. at 6].

On August 20, 2014, a third X-ray revealed that Hughes had severe facet arthrosis at L4–L5 with spondylolistheses on flexion and extension. [*Id*.]. Hughes underwent another MRI on August 27, 2015, which revealed moderate central canal stenosis and moderate to severe bilateral neural foraminal stenosis at C5–C6. [*Id*.]. On September 3, 2014, a neurosurgeon, Andrew Losiniecki, M.D., noted a disc herniation at C5–C6. [*Id*.]. On October 28, 2014, Dr. Losiniecki recommended anterior cervical discectomy and fusion surgery, but stated that Hughes would need to stop smoking for two weeks before and six weeks after the surgery. [*Id*.]. In January

5

2015, Dr. Losiniecki refused to perform the surgery until Hughes was able to quit smoking. [*Id*.].

### 2. Opinion Evidence

Four doctors have provided opinions as to Hughes' functional limitations. Dr. Martinez, Hughes' treating physician has completed multiple residual functional capacity ("RFC") questionnaires. [*Id*.]. On July 29, 2013, Dr. Martinez opined that Hughes could lift only ten pounds; could only sit or stand for ten to fifteen minutes at a time; would need breaks every fifteen to sixty minutes; could use hands, fingers, and arms only ninety percent of the work day; would need to be out of work more than four times a month; and was not physically capable of working eight hour days five days a week. [*Id*.].

Dr. Martinez completed two additional questionnaires in January and February of 2014. In these questionnaires, Dr. Martinez stated that Hughes had a weight lifting restriction of ten pounds; could only walk a quarter of a city block; could sit for thirty minutes and stand for ten minutes; would need ten minute breaks every thirty minutes; could repetitively use fingers and hands only eighty percent of the workday and reach only fifty percent of the workday; would need to be absent from work more than four times a month; and was not capable of working eight hour days five days a week. [*Id*. at 7]. Dr. Martinez filled out a final questionnaire on February 13, 2015. This questionnaire stated that Hughes could only sit for ten minutes and stand for five minutes; would need five minute breaks every ten to fifteen minutes; could lift up to ten pounds but no more; could repetitively use hands and fingers only twenty-five percent of the workday and reach only ten percent of the workday; would be absent from work more than four times a month; and was not physically capable of working eight hours a day five days a week. [*Id*.].

6

On May 15, 2013, Hughes was seen by Babatunde Onamusi, M.D. for a consultative examination. [*Id*.]. Dr. Onamusi's examination revealed that Hughes' back flexibility was below normal and that she had an antalgic gait, stiff posture, mild to moderate pain while walking, pain while squatting, restricted motion of the back, moderate pain during active motion, and moderate tenderness in the lumbosacral region. [*Id*.]. However, Dr. Onamusi noted that Hughes had minimal trouble transferring on and off the examination table and that a straight leg test was negative on both legs. Dr. Onamusi also noted that Hughes could do fine finger movements like buttoning buttons, tying knots, picking up coins, holding pens, pulling zippers, and opening doors. [*Id*.]. Dr. Onamusi stated that Hughes had chronic back pain and was capable of engaging in sedentary activities. [*Id*.].

Finally, two state agency physicians provided opinions as to Hughes' functional limitations. State agency medical consultants are "highly qualified" and "experts" in Social Security disability evaluation. 20 C.F.R. § 404.1513(a)(b)(1). In June 2013, J. Sands, M.D., opined that Hughes could perform "light exertional work," and in September 2013, M. Brill, M.D., also stated that Hughes was capable of performing "light" work. [DE 20 at 6]. Light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b).

### C. The ALJ's Determination

After the hearing, the ALJ issued a written decision reflecting the following findings based on the five-step disability evaluation prescribed in the SSAs regulations. *See* 20 C.F.R. §§ 404.1520, 416.920[1]. Preliminarily, the ALJ found that Hughes met the insured status requirements of the Social Security Act through March 3, 2015. At Step One, the ALJ found that

---

[1] The regulations for DIB and SSI are identical. Therefore, the Court will only cite to the DIB regulations found in 20 C.F.R. Part 404 throughout the rest of this Opinion and Order.

7

Hughes has not engaged in substantial gainful activity since May 18, 2012, the alleged onset date. At Step Two, the ALJ found that Hughes did suffer from a severe medical impairment, namely, degenerative disc disease of the cervical and lumbar spine. Additionally, the ALJ found that Hughes suffered from several non-severe impairments including chronic obstructive pulmonary disease, dysphagia, and depression. However, at Step Three, the ALJ found that neither Hughes' severe impairment, nor her combination of impairments met or medically equaled a listing under 20 C.F.R. Part 404, Subpart P, Appendix 1.

Before proceeding to Step Four, the ALJ is required to determine the claimant's Residual Functional Capacity ("RFC"). The ALJ found that Hughes has an RFC to perform less than light work as defined in 20 C.F.R. 404.1567(b). Specifically, he found that Hughes can:

> lift and carry twenty pounds occasionally and ten pounds frequently. [She] can sit for six hours and stand and/or walk for six hours for a total of eight hours in a workday, with normal breaks. [She] can occasionally climb stairs and ramps, but cannot climb ladders, ropes, and scaffolds. [She] can occasionally balance but never on uneven, narrow, or steep surfaces. [She] can occasionally stoop, kneel, crouch, and crawl. [She] can never work around unprotected heights but can frequently work around moving mechanical parts, humidity and wetness. [She] can frequently operate a motor vehicle.

[DE 9 at 23]. At Step Four, the ALJ found that Hughes has no past relevant work experience. [*Id.* at 26]. Finally, at Step Five, the ALJ considered Hughes' age, education, work experience, and RFC, and determined that jobs exist in significant numbers in the national economy that Hughes could capably perform. [*Id.* at 27]. Thus completing the five-step analysis, the ALJ determined that Hughes was not disabled.

### III.  STANDARD OF REVIEW

When reviewing the final determination of the Commission under the Social Security Act, the Court must accept the Commissioner's factual finding as conclusive if they are

8

supported by substantial evidence. 42 U.S.C. § 405(g); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Therefore, a court reviewing the decision of an ALJ will only reverse or remand if the ALJ's findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. *Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). The substantial evidence standard requires "more than scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Simply stated, it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Kepple v. Massanari*, 268 F.3d 513, 516 (7th Cir. 2001).

On review, it is the Court's responsibility to examine the entire administrative record; however, the Court does not reconsider facts, re-weigh the evidence, resolve conflicts in the evidence, decide questions of credibility, or otherwise substitute its judgment for that of the ALJ. *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005). Thus, the task for the Court on judicial review is not to resolve the question of whether the claimant is, in fact, disabled, but whether the ALJ "use[d] the correct legal standards and the decision is supported by substantial evidence." *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013). In other words, the ALJ must build a logical bridge from the evidence to his conclusion. *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). The reviewing court's task is only to determine whether the bridge adequately covered the span and was constructed from the appropriate legal materials.

At minimum, the ALJ must articulate his analysis of the evidence such that the reviewing court can follow his reasoning and ensure that he considered all the important evidence. *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). The ALJ is not required to address specifically every piece of evidence in record, but he must build a "logical bridge" from the evidence to his

9

conclusions. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010). The ALJ must provide a sufficient glimpse into the reasoning underlying his analysis and the determination to deny benefits. *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001).

## IV. ISSUE FOR REVIEW

In this case, Hughes argues that the ALJ's decision should be vacated and remanded because the ALJ's RFC determination is not supported by substantial evidence. Specifically Hughes argues that the ALJ erred in discounting the opinion of her treating physician, discounting the opinion of her consultative examiner, and in not supporting his credibility determination with substantial evidence. Hughes argues, in essence, that the ALJ did not build a "logical bridge" from the evidence to his eventual RFC finding that Hughes was capable of "less than light" work. She argues that the evidence shows that she is capable of sedentary work at most. She contends that, given her age and impairments, an alternative RFC finding of sedentary work would have resulted in the finding that she is disabled. [DE 15 at 13–14].

### A. RFC Standard

An individual's RFC represents her maximum ability to work despite physical or mental limitations. 20 C.F.R. § 404.1545(a)(1). "The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." SSR 96-8p. When making an RFC determination, the ALJ must consider all of the relevant evidence in the case record. 20 C.F.R. § 404.1545(a)(1). In doing so, the ALJ must give "careful consideration…to any available information about symptoms because subjective descriptions may indicate more severe limitations or restrictions than can be shown by objective medical evidence alone." SSR 96-8p. It is, however, the claimant's responsibility to provide medical evidence showing her impairments affect her functioning. 20 C.F.R. § 404.1545(a)(30.

10

Therefore, when the record does not support specific physical or mental limitations or restrictions on a claimant's work related activity, the ALJ must find that the claimant has no related functional limitations. *See* SSR 96-8p.

### B. Opinion Evidence

Hughes contends that the ALJ erred when determining her RFC by discounting the opinion of her treating physician, Dr. Martinez, and the opinion of her consultative examiner, Dr. Onamusi. The regulations specify that it is the ALJ's role to weigh the medical opinions when determining a claimant's RFC. 20 C.F.R. § 404.1527. In a situation where there are conflicting medical opinions, "it is for the ALJ to decide which doctor to believe." *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996). In the Seventh Circuit, a medical opinion may be discounted if it is internally inconsistent or inconsistent with other substantial evidence in the record. *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). The Court reviews an ALJ's decision regarding the appropriate weight to give a medical opinion from a highly deferential, even "lax," standard. *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008). In other words, courts "uphold[] all but the most patently erroneous reasons for discounting a treating physician's assessment." *Luther v. Astrue*, 358 F. App'x 738, 740 (7th Cir. 2010).

Hughes is correct that, as a general matter, more weight is given to the opinion of a treating physician because they are more familiar with the claimant's particular conditions and circumstances. *See Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003) (citing *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000)). However, a treating physician's opinion is given controlling weight only where it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence…." 20 C.F.R. § 404.1527(c)(2). If the ALJ does not afford the treating physician's opinion controlling

11

weight, he must articulate, at a minimum, his reasoning for not doing so. *Hofslien v. Barnhart*, 439 F.3d 375, 376–77 (7th Cir. 2006).

The ALJ set forth in his decision his reasons for finding Dr. Martinez's opinions both internally inconsistent and inconsistent with the record as a whole. [DE 9 at 26]. The ALJ cited "notable discrepancies" in Dr. Martinez's opinions. He pointed out that Dr. Martinez reported that Hughes could "use her hands for fine manipulation as well as grasping, turning, and twisting objects" only eighty percent of the time on February 12, 2014, and only twenty-five percent of the time on February 13, 2015. [*Id.*]. The ALJ then compared those reports to Hughes' consultative examination on May 15, 2013, where she "had no difficulty with fine coordination and manipulative tasks, and she was able to tie knots, button buttons, pick up coins, hold pens, turn door handles, pull zippers, and engage in other fine finger movements." [*Id.*]. Additionally, the ALJ noted that Hughes reported limitations to Dr. Martinez that are inconsistent with other evidence in the record. The ALJ cites Hughes' report to Dr. Martinez that she needed "frequent assistance with basic tasks, as well as an inability to perform any chores, hobbies, driving or assistance." [*Id.*]. However, the ALJ pointed out that these claims are inconsistent with other functional limitation reports and her records as a whole. [*Id*.] Finally, the ALJ stated that Dr. Martinez's opinions were seemingly based on exaggerated complaints made by Hughes as other substantial evidence indicated that she was not as limited as she suggested to Dr. Martinez.

Hughes argues that the inconsistencies in Dr. Martinez's testimony are, in fact, consistent with the record as a whole and not based on exaggerated complaints. Instead, Hughes contends that Dr. Martinez's testimony is consistent with Hughes' condition worsening. [DE 15 at 13]. While it is certainly the case that the evidence could be consistent with a worsening condition, Hughes has not demonstrated that no other interpretation of the evidence is possible. Where the

12

evidence is inconsistent, it is the role of the ALJ to consider the facts and resolve conflicts in the evidence. *Books*, 91 F.3d at 979. The ALJ's decision articulated that he chose to give little weight to Dr. Martinez's opinion because he found it internally inconsistent and inconsistent with other substantial evidence in the record, including her function reports. The ALJ therefore built a logical bridge from the inconsistent evidence to his conclusion about the weight to afford Dr. Martinez's opinion such that the decision is not patently erroneous. *See Luther*, 358 F. App'x at 740.

Similarly, Hughes argues that the ALJ erred in discounting the opinion of Hughes' consultative examiner, Dr. Onamusi. The ALJ determined that Dr. Onamusi's opinion was entitled to little weight because it was vague and inconsistent with other substantial evidence in the record. [DE 9 at 25]. The ALJ acknowledged that Dr. Onamusi stated, "the claimant is engaging in sedentary work," however, he found that the opinion was unclear as to whether this was the highest level of work Hughes could perform. [*Id.*] Reviewing Dr. Onamusi's clinical findings, the ALJ determined that they did not suggest that Hughes was limited to only sedentary work. [*Id.*] The ALJ points to the following aspects of Dr. Onamusi's clinical findings, which suggest that Hughes may be capable of more than sedentary work: (1) she did not require an assistive device to walk, (2) she had minimal trouble transferring onto or off the examination table, (3) she was able to walk on heels and toes, and (4) she was able to use her hands for fine coordination and manipulative tasks. [*Id.* at 24–25].

The ALJ also found that Dr. Onamusi's opinion to be inconsistent with other substantial evidence—namely, the opinions of the State agency physicians. Dr. Sands and Dr. Brill, the state agency medical consultants, examined Hughes' medical records and determined that she was capable of working at a "light exertional level." [*Id.* at 25]. The ALJ found these medical

13

opinions more consistent with the record as whole and afforded them greater weight. [*Id*.]. In light of the ALJ finding Dr. Onamusi's opinion internally inconsistent and inconsistent with other substantial evidence his determination that Dr. Onamusi's opinion was entitled to little weight is not patently erroneous.

Rather than deferring to the opinions of Dr. Martinez and Dr. Onamusi, the ALJ gave considerable weight to the opinions of the State agency medical consultants discussed above. He found the agency medical consultants' determination that Hughes was capable of work at a "light exertional level" to be consistent with the record as a whole. [DE 9 at 25]. However, in making his final RFC determination, the ALJ did not rely solely on the opinions of the State's medical consultants. Taking into account Hughes' hearing testimony, he also considered "additional postural and environmental limitations" when assessing her RFC. [*Id*.] Thus, while still giving the agency consultants' opinions considerable weight, the ALJ's final determination that Hughes was capable of performing "less than light work" acknowledged that Hughes' condition required more restrictive functional limitations.

In effect, the ALJ took four divergent medical opinions and found that Hughes' actual functional limitations lay somewhere in the middle. While it is possible that the record could support a different RFC as Hughes suggests, the ALJ satisfied his burden of "minimally articulat[ing]" his reasons for discounting the opinions of Dr. Martinez and Dr. Onamusi. *See Berger*, 516 F.3d at 545. As a result, his decision to give more weight to the opinions of the State agency physicians was not "patently erroneous." Weighing the opinions in this way, the ALJ determined that Hughes was capable of performing work at a level in between "light" and "sedentary." The ALJ adequately explained his reasoning for giving the medical opinion

evidence this weight and supported his decision with substantial evidence. Therefore, his determination is not "patently erroneous."

        **C.**        **Credibility Determination**

Hughes also argues that the ALJ did not support his credibility determination regarding Hughes' subjective symptoms with substantial evidence. The ALJ is required to follow a two-step process when assessing a claimant's subjective symptoms. SSR 96-7p. At the first step, the ALJ must decide whether there is a medically determinable impairment that can be shown by acceptable medical evidence and can be reasonably expected to produce the claimant's pain or other symptoms. *Id.* If such an underlying impairment exists, the ALJ must evaluate the intensity, persistence, and limiting effects of the impairment to determine the extent to which the symptoms limit the claimant's ability to work. *Id.* Whenever a claimant's statements about the symptoms and limitations of his or her impairment are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the individual's statements based on the entire case record.[2] *Id.* Where conflicting evidence allows reasonable disagreement as to whether a claimant is disabled, the responsibility for that decision falls to the ALJ. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990).

Because a claimant's subjective symptoms are difficult to verify, the Seventh Circuit has held that an ALJ is "not obliged to believe all [of a claimant's] testimony." *Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir. 2006). "Applicants for disability benefits have an incentive to exaggerate their symptoms, and an administrative law judge is free to discount the applicant's testimony on the basis of the other evidence in the case." *Id.* The ALJ is in a special position to

---

[2] When objective medical evidence is not enough to assess an individual's credibility regarding the effect pain has on his or her functional capabilities, the ALJ must consider a number of factors including the individual's daily activities, the frequency and intensity of pain, the effective of medication, and other factors concerning functional limitations and restrictions due to pain. SSR 96-7p.

15

assess witnesses; therefore, his credibility determinations are given special deference and will only be overturned if they are patently wrong. *Shideler v. Astrue*, 688 F.3d 306, 310–11 (7th Cir. 2012). An ALJ's credibility determination will be considered patently wrong only when the determination "lacks any explanation or support." *Elder v. Astrue*, 529 F.3d 408, 413–14 (7th Cir. 2008).

Here, the ALJ determined that Hughes' medical impairments could be reasonably expected to produce her alleged symptoms. [DE 9 at 23]. However, the ALJ did not find Hughes' testimony regarding the severity of her symptoms and the extent of her limitations entirely credible. [*Id*. at 24]. He acknowledged that Hughes claims to suffer from severe pain, even "10 out of 10," but that "the record generally indicates that she does not appear to be in acute distress." [*Id.* at 25]. In making this determination, the ALJ cited inconsistencies in Hughes' reported functional limitations and pain levels. [*Id.*] He cited Hughes' consultative examination, in which Dr. Onamusi noted Hughes to be in pain only when walking and squatting. [*Id.*]. He also pointed out that Hughes reported to Dr. Martinez that she was "unable to perform any chores, hobbies, or social activities," but at her hearing testified that "she splits chores with her boyfriend." [*Id.*]. The ALJ determined that "the record generally indicates that she does not appear to be in acute distress." [*Id.*].

Hughes contends that the ALJ's credibility determination is not supported by substantial evidence for several reasons. First, she argues that the ALJ inappropriately relied on Hughes' ability to perform independent housework to support his credibility determination. [DE 15 at 15]. The Court recognizes that a person's ability to engage in sporadic physical activities and perform housework does not mean that he or she is capable of maintaining the concentration and effort necessary for full-time work. *See Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir.

16

2004). However, the ALJ is entitled consider evidence of a claimant's daily activities when assessing credibility. 20 C.F.R. § 404.1529(c)(3). Here, the ALJ did not present Hughes' daily activities as proof that she is capable of working full-time. Rather, in making his determination based on the entire record, the ALJ viewed Hughes' ability to perform independent housework as evidence supporting the State agency physicians' determination that she was capable of performing light work.

Second, Hughes argues that the ALJ erred by incorrectly relying on her inability to quit smoking so that she could undergo surgery as evidence that her pain is not as severe as she claims. [DE 15 at 14]. Hughes is certainly correct that "it is extremely tenuous to infer from the failure to give up smoking that the claimant is incredible when she testifies that the condition is serious or painful." *Shamrek v. Apfel*, 226 F.3d 809, 813 (7th Cir. 2000). However, while the ALJ did "note" Hughes' inability to quit smoking in his opinion, it is not the sole reason—nor the primary reason—underlying his credibility determination. [DE 9 at 25]. As such, merely raising the issue in his opinion does not render the ALJ "patently wrong" given the other evidence cited in his opinion.

Finally, Hughes argues that the ALJ's credibility determination is unsupported by substantial evidence because he cited straight leg tests performed on Hughes that returned negative results, but left out multiple straight leg tests that returned positive results. [DE 15 at 14]. Notably, ALJs are not required to discuss every piece of evidence in the record. *Pepper v. Colvin*, 712 F.3d 351, 362–63 (7th Cir. 2013). However, an ALJ must not ignore evidence that is contrary to his finding. *Zurawski*, 245 F.3d at 888–89. Because the ALJ specifically mentioned, and relied upon, Hughes' negative straight leg tests, he also should have accounted for the directly contrary positive tests in his analysis. However, the ALJ's failure to cite the positive

tests does not, on its own, support remand here because it constitutes harmless error. *See Villano v. Astrue*, 556 F.3d 558 (7th Cir. 2009) (applying the harmless error doctrine in an appeal from denial of disability benefits). The ALJ presented the evidence of negative straight leg tests alongside other evidence in the record suggesting that Hughes was not in "acute distress." [DE 9 at 24]. Specifically, the ALJ cites the negative straight leg tests in conjunction with the clinical findings of Hughes' consultative examination indicating that she did not require an assistive device to walk, had minimal trouble transferring onto or off the examination table, was able to walk on heels and toes, and was able to use her hands for fine coordination and manipulative tasks. [*Id*. at 23–24]. Arguably, the presence of negative straight leg tests, even considered next to the positive tests, is evidence that Hughes' condition is not as persistently debilitating as she alleges. Therefore, the ALJ's omission of the positive straight leg tests constitutes harmless error and does not render his determination patently wrong.

Hughes contends that the ALJ erred in making his RFC determination because he weighed the medical opinion evidence inappropriately and did not support his credibility determination with substantial evidence. However, the ALJ's final RFC determination of "less than light work" is not "patently erroneous." The ALJ "minimally articulated" his reasons for interpreting the opinion evidence as he did, and he adequately explained his reasoning for determining that Hughes' subjective symptoms were not as severe as she claimed. The ALJ supported both of these decisions with substantial evidence, and, therefore, his final RFC determination is not patently wrong.

## V.     CONCLUSION

In essence, the ALJ in this case was presented with conflicting evidence. Two doctors' opinions stated that Hughes was capable of light work. Another opinion suggested Hughes was

capable of at least sedentary work, and a fourth doctor opined that Hughes was disabled. The other medical records do not clarify the picture. Multiple straight leg tests have been administered—at times they have been positive, and at other times they have been negative. There is conflicting evidence as to the patient's capability of performing fine motor skills, and there are inconsistencies in Hughes' other functional limitations in both her accounts and the reports of her doctors.

It is the role of the ALJ to weigh and resolve conflicts in the evidence, and this Court must give the ALJ's determination due deference and only overturn the decision if patently wrong. From this Court's deferential vantage point, the ALJ pointed to more than a scintilla of evidence in the record supporting his determination that Hughes is not disabled. When making his RFC determination, the ALJ minimally articulated his reasons for giving the medical opinions the weight he did and for determining that Hughes' claims were not entirely credible. Therefore, he was not patently wrong in reaching the conclusion that Hughes was capable of performing less than light work. Thus, the Court **AFFIRMS** the Commissioner's decision pursuant to sentence four of 42 U.S.C. § 405(g). The Clerk is instructed to term the case and enter judgment in favor of the Commissioner.

**SO ORDERED.**

Dated this 13th day of December 2017.

s/Michael G. Gotsch, Sr.  
Michael G. Gotsch, Sr.  
United States Magistrate Judge